UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LESLEY KAPLAN,

              Plaintiff,

     v.

SETERUS, INC., et al.,

              Defendants.

Case No. 16-cv-02940-JCS

**ORDER GRANTING IN PART MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. No. 80

## I.  INTRODUCTION

Defendants Federal National Mortgage Association and Seterus, Inc. (collectively, "Seterus") move for summary judgment on all remaining claims brought by Plaintiff Lesley Kaplan, which consist of a claim under the federal Real Estate Settlement Procedures Act ("RESPA") and a claim under California's Consumer Credit Reporting Agencies Act (the "CCRAA"). The Court held a hearing on August 11, 2017. For the reasons discussed below, Seterus's motion is GRANTED as to Kaplan's RESPA claim, and Kaplan's CCRAA claim is REMANDED to the Superior Court of California for Contra Costa County.[1]

## II.  BACKGROUND

### A.  Factual Record

Kaplan obtained a loan of $280,000 on September 13, 2005, secured by a deed of trust encumbering real property—Kaplan's home—at 2910 Euclid Avenue, Concord, California. *See* Seterus Decl. (dkt. 80-2)[2] ¶ 5 & Ex. 1 (Adjustable Rate Note); Def.'s Req. for Judicial Notice

---

[1] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

[2] Seterus submits a declaration purportedly on behalf of the corporation, but made by one of its employees, Michal McNeal, consisting of "information . . . assembled by employees of Seterus, with the assistance of counsel, based on a review of Seterus' record, and from personnel in the appropriate offices and departments of the aforesaid entities" (sic; no "entities" other than Seterus

United States District Court
Northern District of California

("Def.'s RJN," dkt. 80-3) Ex. 1 (Deed of Trust). In May of 2011, Kaplan received a modification of her loan through the Home Affordable Modification Program ("HAMP"), which reduced her monthly interest rate to 2.23% and reduced her monthly payment to $1,614.11. Seterus Decl. ¶¶ 6–7 & Ex. 2 (Modification Agreement). About two years later, in March of 2013, Kaplan filed for Chapter 13 bankruptcy. Kaplan Decl. (dkts. 81-1, 83-1[3]) ¶ 2; Def.'s Request for Judicial Notice ("Def.'s RJN," dkt. 80-3) Ex. 2; *see generally In re Kaplan*, No. 13-41536 (Bankr. N.D. Cal.). Kaplan's pay had been reduced during the 2008 recession, and she was two months delinquent on her loan payments at the time she filed for bankruptcy. Kaplan Decl. ¶¶ 2, 3.

Kaplan's bankruptcy plan called for her to pay back her two month delinquency through periodic payments to the bankruptcy trustee over the course of five years, ending in March of 2018. *Id.* ¶ 4; Pl.'s Request for Judicial Notice ("Pl.'s RJN," dkt. 81-2) Ex. K (Chapter 13 Plan) ¶ 1. Kaplan has at all relevant times stayed current with her payments to the bankruptcy trustee. Kaplan Decl. ¶ 5. The plan also called for her to make ongoing payments for amounts due after the date of her bankruptcy petition directly to the lender, as she had done before, but set at the amount of $1,589.31 per month. *Id.* ¶ 4; Pl.'s RJN Ex. K ¶ 4. In October of 2013, Kaplan could only afford a partial payment of $1,259.52, which was placed in suspense until she could pay the remaining portion of that month's payment. *Id.* ¶ 6.

In September of 2014, Kaplan's loan was assigned from Chase to the Federal National Mortgage Association ("Fannie Mae"), and Seterus became the servicer for the loan. *Id.* ¶ 7; *see* Seterus Decl. ¶ 3.

In February of 2015, Kaplan was unable to afford her monthly payment on the loan and called Seterus to ask how she should proceed. Kaplan Decl. ¶ 9. A Seterus representative "advised [Kaplan] that, because [she] was in active bankruptcy, all of [her] payments were

---

are previously mentioned in the declaration). *See* Seterus Decl. ¶ 2. Kaplan does not object to this unorthodox practice, and the Court therefore assumes for the purpose of this motion that Seterus could, at the very least, present the contents of that declaration and its exhibits in a form that would be admissible at trial. *See Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003).
[3] Kaplan's initial declaration (dkt. 81-1) erroneously failed to state that it was made under penalty of perjury. Kaplan filed an otherwise identical corrected declaration (dkt. 83-1) to redress that omission.

voluntary," and declined to explain that assertion further. *Id.* The representative also told Kaplan that she "was missing multiple installments on the account." *Id.* In another call later that month, a Seterus representative told Kaplan that she had "missed payments in October 2011, April 2012, and October 2013," and that she should submit a written request to Seterus to research the issue if she believed there was an error. *Id.* ¶ 10. Kaplan did not make a payment for February of 2015. *Id.* ¶ 9.

On March 16, 2015, Kaplan called Seterus again and faxed a letter to Seterus that reads as follows:[4]

> Dear Seterus:
>
> I am sending this as a written request to have my payment history looked at by the Research Department.
>
> My loan was purchased from Chase by you and there seems to be some errors on your part.
>
> You have told me that I missed a payment in:
>
> • April 2012
> • October 2013 – my payment was returned to my bank, Wells Fargo
>
> Again, I am asking for your Research Dept to review. I have attached proof of my payments for the above two mentioned months. I pay by bill pay through my bank, Wells Fargo, and have attached my bank statements. For October, I did pay a slightly less amount and the money was put in SUSPENSE – not returned.
>
> I just had the money applied today to my account. By my records, I should only owe for one month since the monies in suspense will be enough for almost two months, less $221.04.
>
> Thank you,
>
> Lesley Kaplan

Kaplan Decl. ¶ 11 & Ex. A; Seterus Decl. ¶ 8 & Ex. 3. Although Kaplan's letter referenced a payment purportedly missed in "April 2012," the attached proof of payment (a bank statement) highlights a payment made on March 29, 2012. Seterus Decl. Ex. 3 at FNMA-000936.

---

[4] Because the nature of the parties' correspondence is a central issue of the present motion, this order reproduces much of that correspondence. Dates, addresses, and other information outside the main body of the correspondence are generally omitted.

On April 10, 2015, Kaplan's bankruptcy attorney Thomas Burns sent an email to attorneys for Seterus stating that Kaplan "continues to get conflicting information about the status and payment history of her loan" and that her "position is that she remains post-petition current on this loan." Seterus Decl. ¶¶ 13–14 & Ex. 8. Burns requested "a complete accounting" of Kaplan's monthly balances since Seterus began servicing the loan (on the basis that "[i]f Seterus [sic] position is that this account is not post-petition current, then we need to know the basis for why you are showing a default") as well as for monthly statements to be mailed to Kaplan going forward. *Id.* Ex. 8.[5]

Seterus initially responded on April 27, 2015 by sending a letter to Burns, although the response was apparently to Kaplan's March 16 letter rather than to Burns's April 10 email:

> Dear Mr. Burns:
>
> On behalf of Seterus, Inc., I am responding to correspondence received from the above-referenced borrower<s>.
>
> As our records indicate that you represent Lesley Kaplan, we are forwarding our response to her request to your attention for review. If you no longer represent Ms. Kaplan, you may send notice to the correspondence address listed above or you may fax to [fax number omitted].
>
> Ms. Kaplan has written in requesting that we research two payments made to the prior servicer of this loan, one made March 29, 2012 and another made October 3, 2012. As detailed in the enclosed prior servicer payment history, the October 3, 2012 payment was received by the prior servicer and applied to satisfy the August 1, 2012 installment.
>
> We are still research Ms. Kaplan's request for the March 29, 2012 payment and need additional time to complete our review. Upon completion of our research, we will send a more detailed response.
>
> If you have any questions, please contact our customer service department at our toll-free number above.
>
> Sincerely,
>
> Lisa Donnelly

---

[5] After describing Burns's April 10, 2015 email, Seterus's declaration states that Kaplan "through her attorney, had already been sent correspondence dated April 27, 2015, which included a loan account history and information regarding a payment made in October 2013." Seterus Decl. ¶ 15. Although not ultimately relevant to the present motion, Seterus does not explain how on April 10, Kaplan and Burns could have "already" been sent correspondence dated seventeen days later.

Seterus Decl. ¶ 10 & Ex. 5. Seterus enclosed with that letter a document showing account activity on Kaplan's loan from October 3, 2012 through the assignment of the loan on September 2, 2014. *Id.* Ex. 5. According to that activity log, each of Kaplan's payments from October of 2012 through October of 2013 was applied to amounts due two months before the payment, and each payment thereafter was applied to amounts due three months before the payment. *Id.*

Seterus responded directly to Kaplan on May 7, 2015 as follows:

Dear Lesley Kaplan:

We are writing regarding your request to research a payment(s). Our research has resulted in the following:

| Check Number or Wire | Date | Amount | Resolution |
|---|---|---|---|
| NA | 3/29/2012 | $1618.24 | The funds were posted to the loan by your prior servicer before the loan was transferred to Seterus |
| NA | 10/8/2013 | $1259.52 | The funds were posted to the loan by your prior servicer before the loan was transferred to Seterus |

If you have any questions, please contact us at our toll-free number above.

Sincerely,

Seterus, Inc.

Kaplan Decl. ¶ 12 & Ex. B; Seterus Decl. ¶ 11 & Ex. 6.

On May 18, 2015, Seterus sent a longer letter to Burns, the bankruptcy attorney, explaining that Kaplan's March 2012 payment was "applied to the loan to satisfy the February 1, 2012 contract installment," and her October 2013 payment was "applied to satisfy the August 1, 2013 contract installment." Kaplan Decl. Ex. C; Seterus Decl. ¶ 12 & Ex. 7. According to that letter, Seterus "cannot speak to the actions of the prior servicer in their application of funds to the loan."

Kaplan Decl. Ex. C; Seterus Decl. Ex. 7. Seterus's letter attached records of Kaplan's payment history, including the same activity report that was attached to the earlier letter to Burns showing activity through September 2014, as well as records from 2015 showing payments being applied to debts due four months prior. Seterus Decl. Ex. 7. The letter indicated, in a somewhat convoluted manner, that its accounting of Kaplan's debt and payments was based on the terms of the contract, not on the terms of the bankruptcy payment plan:

> Although all Bankruptcy plan payments may be received on time and the loan may be current according to the terms of the Bankruptcy payment plan, the funds received may not be sufficient to bring the loan to a contractually current status. Therefore, the account may be due for an earlier installment according to the contractual terms of the loan, and at the same time due for a later installment according to the terms of the Bankruptcy plan. The contractual delinquency may continue until the arrears are paid in full by the Bankruptcy Trustee.

*Id.*; Kaplan Decl. Ex. C.

Kaplan responded to Seterus by fax on November 30, 2015:

> Dear Seterus:
>
> I am sending this fax as written response to your written correspondence to my attorney dated May 18, 2015.
>
> In that correspondence, you mentioned 3 outstanding items related to my loan:
>
> • That I owe $1585.84 for February, 2015
> • That funds in the amount of $1338.49 are in suspense. I just phoned today and the amount in suspense is: $1352.80.
> • And that when the loan was transferred to Seterus from Chase in September, 2014 the loan was delinquent for June, 2014. This was told to me after I requested the Research Department in March, 2015 to conduct a payment history. It took the Research Department 2 months to conduct this review and I was informed in May, 2015 of the delinquent month.
>
> Here is my response:
>
> • Yes, I do owe the $1585.84 for February, 2015 and will be paying in February, 2016 in full.
> • I am sending in, through the mail, payment in the amount of $206.72 to go to the suspense payment.
> • I am attaching proof that I paid the June 2014 payment. I pay my bills through my bank, Wells Fargo, and have attached my bank statement not only for June but for May, July, and August as well. Obviously Chase made an error when transferring the account to Seterus.

> I expect you, the Research Department, to make this right and correct this outstanding delinquent amount and reflect this on my credit report as well.
>
> Thank you,
>
> Lesley Kaplan.

Kaplan Decl. ¶ 16 & Ex. E; Seterus Decl. ¶ 16 & Ex. 9.

Kaplan also sent a letter by mail on November 30, 2015, attaching a check for $206.72 and requesting that Seterus apply that money to make whole the previous incomplete payment October 2013 payment (erroneously referenced in Kaplan's letter as "October, 2014").  Kaplan Decl. ¶ 15 & Ex. D; Seterus Decl. ¶ 16 & Ex. 9.

Seterus's response to Kaplan's November fax, sent just one day later on December 1, 2015, was similar to its May 7 response to her first fax:

> Dear Lesley Kaplan:
>
> We are writing regarding your request to research a payment(s). Our research has resulted in the following:

| Check Number or Wire | Date | Amount | Resolution |
|---|---|---|---|
| NA | 5/6/14 | $1559.52 | The funds were posted to the loan by your prior servicer before the loan was transferred to Seterus |
| NA | 6/3/14 | $1559.52 | The funds were posted to the loan by your prior servicer before the loan was transferred to Seterus |
| NA | 7/7/14 | $1559.52 | The funds were posted to the loan by your prior servicer before the loan was transferred to Seterus |

| | | | |
|---|---|---|---|
| NA | 8/6/14 | $1559.52 | The funds were posted to the loan by your prior servicer before the loan was transferred to Seterus |

If you have any questions, please contact us at our toll-free number above.

Sincerely,

Seterus, Inc.

Kaplan Decl. ¶ 17 & Ex. F; Seterus Decl. ¶ 17 & Ex. 10.

Later in December of 2015, Kaplan obtained a copy of her Equifax credit report, which stated that she was past due on her loan by $6,343, or four monthly payments. Kaplan Decl. ¶ 18 & Ex. G. Kaplan "contacted Seterus"—presumably by telephone—on December 29, 2015, and was told that although Seterus received her payment in June of 2014, the payment was not necessarily applied to that month's installment. Kaplan Decl. ¶ 19. The representative also told Kaplan that at that time three months' payments were past due (October, November, and December of 2015), but said that Seterus could not update the credit reporting regarding Kaplan's loan because Seterus "could not go back in time." *Id.* Seterus's present declaration, however, states that Kaplan was in fact "contractually delinquent for four (4) monthly installments" in December of 2015. Seterus Decl. ¶ 19.

On February 16, 2016, Kaplan sent Seterus a check for $1,585.84 to account for her delinquency for February of 2015. Kaplan Decl. ¶ 24 & Ex. H. Her letter accompanying that check included the following passage indicating Kaplan's belief that she was up to date on her payments:

> I have shown proof for the June, 2014 payment and received a letter from Seterus acknowledging this payment; and in November, 2015 I sent in funds in the amount of $206.72 to be applied to the funds in the amount of $1352.80 that were in suspense.

> Based on your letter to me dated May 18, 2015, after the Research Department conducted a more than 2-month check on my payment history, I am completely and totally caught up on ALL payments.

*Id.* Ex. H.

In March of 2016, Seterus moved the bankruptcy court for relief from the automatic bankruptcy stay so that Seterus could foreclose on Kaplan's home, stating in its motion that Kaplan was four months behind on her payments, but ultimately withdrew that motion.  Kaplan Decl. ¶ 25; Pl.'s RJN Ex. L.[6]  On September 6 and October 6, 2016, Seterus sent Kaplan letters confirming receipt of her monthly payments but stating that her loan was in default and subject to foreclosure.  Kaplan Decl. ¶¶ 26, 28 & Exs I, J.  According to Kaplan, she was "post-petition current" on her payments at that time.  Kaplan Decl. ¶ 26.

In December of 2016, Kaplan filed a declaration in her bankruptcy proceeding that attached a list of all payments she made on her loan from April of 2013 through March of 2016.  Seterus Decl. ¶ 20 & Ex. 11.  Seterus contends that the payments Kaplan listed are consistent with Seterus's records and accounting of Kaplan's loan.  *Id.* ¶¶ 21–23 & Exs. 12, 13.

Kaplan paid the delinquent February 2015 installment in full in February of 2016, bringing her into compliance with her post-petition payments under the terms of her bankruptcy plan.  Kaplan Decl. ¶ 24.  Several months later, in September and October of 2016, Seterus nevertheless sent Kaplan two letters stating that it had accepted her payments for those months, but the loan was in default and subject to foreclosure, and that Kaplan therefore needed to contact Seterus.  *Id.* Exs. I, J.

Kaplan states in her declaration that she has at times—and particularly after difficult experiences dealing with Seterus—experienced fear, anxiety, difficulty sleeping and eating, heart palpitations, and increased blood pressure.  *Id.* ¶¶ 20, 21, 23, 27.  Seterus's September 2016 letter arrived shortly before with a trip to Yosemite National Park that Kaplan had planned with a friend.  *Id.* ¶ 27.  As a result, Kaplan could not sleep or enjoy the trip, and instead worried about her

---

[6] Seterus had asserted in that motion that Kaplan was delinquent by four monthly payments.  Two of those payments, however, were pre-petition delinquencies that were the subject of Kaplan's Chapter 13 repayment plan, and the remaining delinquencies were cured in February of 2016, before Seterus brought its motion.  Despite having withdrawn the motion before the bankruptcy court held a hearing, Seterus claimed its attorneys' fees and costs for filing the motion.  The bankruptcy court sustained Kaplan's objection to the request for fees and costs.  *See In re Kaplan*, No. 13-41536, ECF Doc. No. 56 (Bankr. N.D. Cal. Nov. 16, 2016) (audio recording of the initial hearing on Kaplan's objection); *Id.*, ECF Doc. No. 59 (Jan. 18, 2017) (audio recording of a subsequent hearing after supplemental briefing).

house. *Id.*

### B. Procedural History and Present Arguments

This case began as a pro se complaint in state small claims court. *See* Notice of Removal (dkt. 1). Seterus removed to this Court and filed both a motion for a more definite statement and an anti-SLAPP motion to strike. *See id.*; Mot. for More Definite Statement (dkt. 9); Mot. to Strike (dkt. 11). Kaplan thereafter obtained counsel and stated her non-opposition to the motion for a more definite statement and her intent to file an amended complaint. *See* dkt. 18. The Court granted that motion and denied the motion to strike as moot. *See* dkt. 21.

Kaplan filed a first amended complaint (dkt. 23) on July 26, 2016, and Seterus moved to dismiss. *See* dkt. 37. Pursuant to a stipulation of the parties, Kaplan filed her operative second amended complaint on October 28, 2016, and Seterus withdrew its motion to dismiss. *See* Stipulation (dkt. 48); 2d Am. Compl. ("SAC," dkt. 49). Defendants answered that complaint, and later amended their answer by stipulation. Answer (dkt. 52); Am. Answer (dkt. 61).

#### 1. Kaplan's Second Amended Complaint

The present complaint includes factual allegations largely consistent with the factual record set forth above. *See generally* SAC. Kaplan's first claim was for violation of the automatic bankruptcy stay, but the Court dismissed that claim without prejudice to Kaplan refiling it in bankruptcy court. *See* SAC ¶¶ 57–67; Civ. Minute Order (dkt. 66). Kaplan's remaining claims in this Court are for violation of RESPA and the CCRAA. With respect to RESPA, Kaplan asserts that Seterus violated that statute by: (1) failing to provide a timely response to her March 16, 2015 fax, SAC ¶ 74.a; (2) failing to make corrections in response to that fax and transmit notice of such corrections, *id.* ¶ 74.b; (3) failing to provide information, as well as contact information for a person who could provide assistance, in response to Burns's April 10, 2015 email, *id.* ¶ 79; (4) failing to make corrections in response to Kaplan's November 30, 2015 fax and transmit notice of such corrections, *id.* ¶ 82; (5) improperly providing information to reporting agencies regarding debts related to the November 2015 fax, *id.* ¶ 84; and (6) various theories related to a January 2016 email from Kaplan's counsel to Seterus, *id.* ¶ 89. With respect to the CCRAA, Kaplan asserts that Seterus reported information that it knew or should have known to be inaccurate

information to credit reporting agencies, including that Kaplan was four months delinquent on her payments in December of 2015. *Id.* ¶ 98. Kaplan seeks statutory and actual damages for the alleged RESPA violations and punitive and actual damages, as well as injunctive relief, for the alleged CCRAA violations. *Id.* at 15 (prayer for relief).

### 2. Waived Claims and Arguments

The present motion includes a number of arguments related to Kaplan's RESPA claim that Kaplan does not oppose, and that this order therefore does not address in detail: (1) that Seterus timely acknowledged Kaplan's March 16, 2015 letter, Mot. (dkt. 80) at 7; (2) that the April 10, 2015 email from Kaplan's bankruptcy attorney Burns was not a qualified written request ("QWR") as defined by RESPA, *id.* at 9–11; (3) that Seterus properly responded to that email even if it was a qualified written request, *id.* at 11–13; (4) that Seterus is entitled to summary judgment with respect to claims based on the January 2016 email from counsel, *id.* at 16–17; and (5) that there is no evidence that Seterus provided information to credit reporting agencies within sixty days after Kaplan sent her November 2015 fax, *id.* at 17–18.

Kaplan concedes that "not all of [the RESPA theories set forth in her complaint] panned out in discovery," and therefore does not oppose the arguments listed above, instead "focus[ing] on her core RESPA claims concerning [Seterus's] lack of an adequate response to her [March and November 2015 faxes]." Opp'n (dkt. 81) at 8 n.5. In light of Kaplan's explicit waiver of these arguments, the Court holds that Seterus is entitled to summary judgment on RESPA theories of recovery based on its purported failure to provide a timely response, SAC ¶ 74.a, the April 2015 email from Burns to Seterus, *id.* ¶ 79, the January 2016 email, *id.* ¶ 89, and Seterus's purported improper credit reporting after the November 2015 fax, *id.* ¶ 84.

### 3. Seterus's Motion

Seterus seeks summary judgment on all claims. Mot. at 1. This overview of Seterus's motion omits the arguments set forth above that Kaplan does not oppose.

Seterus describes Kaplan's March 16, 2015 fax—which disputed Seterus's contention that Kaplan missed payments in April 2012 and October 2013, requested review by Seterus's research department, and asserted that Kaplan should only owe one month's payment at that time—as a

"purported" or "alleged" QWR, but does not actually argue that this fax fails to meet the standard for a QWR under RESPA. *See id.* at 7; Seterus Decl. Ex. 3. Instead, Seterus contends that it properly responded to the March fax by sending an initial response to Kaplan's bankruptcy attorney Thomas Burns on April 27, 2015 acknowledging that an October 3, 2012 payment[7] was received and applied to her installment due in August of 2012 and requesting additional time to research the March 29, 2012 payment, and then by sending a letter to Kaplan on May 7, 2015 stating that her March 2012 and October 2013 payments were received and applied to the loan by the prior servicer. Mot. at 8. According to Seterus, "the undisputed facts" therefore "establish that Seterus properly responded to [Kaplan's] March 16, 2015, correspondence under the time limits set forth under RESPA and that no correction of the loan was warranted as the payments alleged to have been made by [Kaplan] were, in fact, confirmed to have been received by Seterus via the prior servicer." *Id.* at 9.

Seterus contends that Kaplan's November 30, 2015 fax "is not a QWR" because it "is so scattered that it is nearly impossible to determine what the 'information sought' may be." *Id.* at 14. Even if that fax is a QWR, Seterus argues that it cannot be held liable because "RESPA does not impose a never-ending cycle of liability to respond to repeated and duplicate requests about the same issues," and the November fax "merely wishes to respond to Seterus' [May 18, 2015] letter (six months after it was sent) for the purpose of rehashing prior disagreements." *Id.* at 14–15. Finally, Seterus argues that it properly responded to the November 2015 fax by sending its December 1, 2015 letter confirming receipt of payments in May, June, July, and August of 2014. *Id.* at 15.

More generally, Seterus argues that it was correct to account for Kaplan's loan based on its original terms rather than the terms of her Chapter 13 bankruptcy plan—meaning that the two delinquent payments being repaid under the plan remained delinquent, and each payment Kaplan made going forward was applied to an earlier month—and that "Seterus explained this to her, in

---

[7] Strangely, neither party's briefs acknowledge or address the discrepancy between Kaplan's query regarding an October *2013* payment and Seterus's initial response regarding an October *2012* payment. *See* Mot. at 8.

plain English, on multiple occasions," i.e., the two letters to Kaplan's bankruptcy attorney. *Id.* at 15–16. Seterus also contends that Kaplan has not shown damages under RESPA because Seterus maintained accurate loan records and responded to her requests, and because Kaplan has not shown a sufficient relationship between her alleged damages and the alleged violations. *Id.* at 18–19.

With respect to Kaplan's CCRAA claim, Seterus argues that its report to Equifax that Kaplan was four months late in payments was accurate, and moreover that it is consistent with Kaplan's admissions that she missed two payments before filing for bankruptcy, made a partial payment in October 2013 that she did not cure until after Seterus reported information to Equifax, and missed a payment in February 2015 that she also did not cure until after Seterus reported to Equifax. *Id.* at 20–22.

### 4. Kaplan's Opposition

Kaplan's primary argument is that Seterus violated both RESPA and the CCRAA by failing to account for her bankruptcy repayment plan and instead continuing to treat her loan as delinquent by the two monthly payments that she is repaying through that plan. *See* Opp'n at 5–7; 12–13. Kaplan cites one decision from this district holding that failure to account for a Chapter 13 plan violates the federal Fair Credit Reporting Act ("FCRA"), as well as a handful of bankruptcy court decisions, but acknowledges that many cases in this district have held to the contrary. *Id.* at 12–13 & n.6 (principally citing *Aulbach v. Experian Info. Sols., Inc.*, __ F. Supp. 3d __, No. 16-cv-05617-VC, 2017 U.S. Dist. LEXIS 69004, 2017 WL 1807612 (N.D. Cal. May 4, 2017)).

According to Kaplan, both the March 2015 fax and the November 2015 fax are QWRs because "both clearly identify the account, and identify that there are accounting errors on the account." *Id.* at 9. Kaplan also contends that none of Seterus's responses satisfied its obligations because none indicated that any errors had been corrected, and because even if Seterus is right that it was not required to make corrections, none of the responses complied with RESPA's requirement that a response in such circumstances must state that no error occurred and that the borrower has the "'right to request documents relied upon by the servicer in reaching its determination.'" *Id.* at 9–10 (quoting 12 C.F.R. § 1024.35(e)(1)(i)(B)). As for relief, Kaplan

argues that her actual emotional distress damages are supported by her declaration and implicate genuine issues of fact, that she is entitled to statutory damages under RESPA because Seterus does not dispute that it has a practice of failing to account for bankruptcy repayment plans, that she is entitled to injunctive relief and emotional distress damages for the purported CCRAA violation, and that she should recover punitive damages under the CCRAA because Seterus's failure to account for the bankruptcy repayment plan is willful. *Id.* at 10–11, 13.

In conclusion, Kaplan requests that the Court deny the motion for summary judgment. Opp'n at 13  In the alternative, however, if the Court grants Seterus summary judgment with respect to Kaplan's RESPA claim, Kaplan requests that her CCRAA claim be remanded to state court. *Id.*

### 5. Seterus's Reply

Seterus argues that *Aulbach*, on which Kaplan relies, represents a distinct minority viewpoint, and that the "Northern District has consistently held that past due balances do not simply disappear when a debtor files a petition for Chapter 13 bankruptcy." Reply (dkt. 82) at 3–4 & n.1. Based on the view of the "resounding majority of courts in the Northern District," Seterus argues that it "has no obligation under RESPA to 'erase' [Kaplan's] past due balance while applying [her] payments to her account during the pendency of her bankruptcy." *Id.* at 4; *see also id.* at 8–9 (making the same argument in the context of Kaplan's CCRAA claim).

Seterus again contends that that it properly responded to Kaplan's March 2015 fax by reporting that the March 2012 and October 2013 payments were "posted to the loan." *Id.* at 5 (citing Kaplan Decl. Ex. B). With respect to the November 2015 fax, Seterus asserts that Kaplan "makes no request for a narrative concerning how her payments are applied in the bankruptcy context," but instead "presents the fact that she made payments in May, June, July, and August of 2014," which Seterus confirmed in its December 1, 2015 response. *Id.* at 6. In response to Kaplan's argument that Seterus's correspondence failed to comply with regulations governing information to be included when a servicer determines that no corrective action is necessary, *see* Opp'n at 9–10 (citing 12 C.F.R. § 1024.35(e)(1)(i)(B)), Seterus contends that this is "an entirely new claim" raised for the first time in the opposition brief, and should not be considered because it

falls outside the scope of the complaint. Reply at 6.

Seterus argues that Kaplan's declaration regarding her damages should be disregarded because it did not state that it was under penalty of perjury,[8] and that even if the Court considers the declaration, Kaplan's emotional distress is not sufficiently related to the alleged violations of RESPA because "[p]resumptively, being in bankruptcy and behind on one's mortgage would be significantly more stress-inducing than receiving an alleged incorrect responses [sic] to a letter." *Id.* at 7–8, 10. Seterus also raises a number of other evidentiary objections to Kaplan's declaration, including that certain passages are not relevant[9] and that Kaplan lacks personal knowledge of what information Seterus is providing to credit reporting agencies or how potential lenders would react to the her credit report. *Id.* at 11–13.

Seterus's reply does not address Kaplan's request that the CCRAA claim be remanded to state court if the Court grants summary judgment on the RESPA claim. *See* Opp'n at 13; *see generally* Reply.

## III. ANALYSIS

### A. Legal Standard

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "specific facts showing there is a genuine issue for trial." *Id.*

---

[8] Kaplan subsequently cured this deficiency by filing an errata letter attaching an identical declaration made under penalty of perjury. *See* dkt. 83. Unless a party *refuses* to provide a properly sworn declaration, the Court expects this sort of oversight to be resolved through communication and stipulation, not through evidentiary objections.

[9] While it is true that certain statements in Kaplan's declaration have little if any direct relevance to the motion, Seterus's relevancy objections are themselves similarly extraneous to the Court's resolution of the motion.

United States District Court
Northern District of California

"[T]he inquiry involved in a ruling on a motion for summary judgment . . . implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 252 (1986). The non-moving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment. *Keenan v. Allan*, 91 F.3d 1275, 1278 (9th Cir. 1996). Thus, it is not the task of the court to scour the record in search of a genuine issue of triable fact. *Id.* at 1229; *see Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); Fed. R. Civ. P. 56(c)(3).

A party need not present evidence to support or oppose a motion for summary judgment in a *form* that would be admissible at trial, but the *contents* of the parties' evidence must be amenable to presentation in an admissible form. *See Fraser v. Goodale*, 342 F.3d 1032, 1036−37 (9th Cir. 2003). Neither conclusory, speculative testimony in affidavits nor arguments in moving papers are sufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979). On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant, *Scott v. Harris*, 550 U.S. 372, 378 (2007), but where a rational trier of fact could not find for the non-moving party based on the record as a whole, there is no "genuine issue for trial" and summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

### B.   RESPA Claim

#### 1.   Overview of RESPA and Chapter 13 Bankruptcy

RESPA provides guidelines for loan servicers to follow when receiving a QWR for information relating to the servicing of a loan from a borrower, or from a borrower's agent. *See* 12 U.S.C. § 2605(e). A QWR is a written correspondence that "(i) includes, or otherwise enables the servicer to identify, the name and account of the borrower, and (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower." 12 U.S.C. §§ 2605(e)(1)(B)(i), (ii). Upon receiving a QWR, the servicer must provide a written response acknowledging receipt of the correspondence within five days, and provide a substantive response to the inquiry within thirty days (excluding weekends and holidays). *Id.*

§§ 2605(e)(1)(A), (e)(2). The substantive response can take one of three forms: making appropriate corrections and transmitting a notice of those corrections to the borrower, *id.* § 2605(e)(2)(A), conducting an investigation and providing the borrower with a written explanation of why the servicer believes the borrower's account is correct, *id.* § 2605(e)(2)(B), or conducting an investigation and either providing information that the borrower requested or explaining why that information is not available, *id.* § 2605(e)(2)(C). The servicer can extend the thirty-day deadline for a substantive response by an additional fifteen days if it notifies the borrower of the reasons for delay within the initial deadline. *Id.* § 2605(e)(4).

Actual damages are available to compensate individual claims under RESPA, but "[a]lleging a breach of RESPA duties alone is not enough. A plaintiff must, at a minimum, allege that the breach resulted in actual damages." *Banh v. Aurora Loan Servs., LLC*, CV 11-06365 PSG, 2012 WL 2202982, at *3 (N.D. Cal. June 14, 2012) (citations omitted). "[U]ncertainty and impending harm, as opposed to actual harm, is insufficient to state a claim for damages under RESPA . . . ." *Id.* (citations omitted). The parties here do not dispute that emotional distress damages are available under RESPA so long as a plaintiff establishes that her emotional distress was caused by a violation of the statute. *See* Mot. at 19 (citing, *e.g.*, *Lawther v. Onewest Bank*, No. C 10-0054 RS, 2010 WL 4936797, at *7 (N.D. Cal. Nov. 30, 2010); Opp'n at 10. A court may award additional statutory damages of no more than $2,000 if the defendant has engaged in "a pattern or practice of noncompliance" with RESPA's requirements. 12 U.S.C. § 2605(f)(1)(B).

As for the bankruptcy procedures at issue, the Supreme Court has briefly described the Chapter 13 process as follows:

> A wholly voluntary alternative to Chapter 7, Chapter 13 allows a debtor to retain his property if he proposes, and gains court confirmation of, a plan to repay his debts over a three- to five-year period. [11 U.S.C.] § 1306(b), § 1322, § 1327(b). Payments under a Chapter 13 plan are usually made from a debtor's "future earnings or other future income." § 1322(a)(1); see 8 Collier on Bankruptcy ¶ 1322.02[1] (A. Resnick & H. Sommer eds., 16th ed. 2014). Accordingly, the Chapter 13 estate from which creditors may be paid includes both the debtor's property at the time of his bankruptcy petition, and any wages and property acquired after filing. § 1306(a). A Chapter 13 trustee is often charged with collecting a portion of a debtor's wages through payroll deduction, and with distributing the withheld wages to creditors.

17

> Proceedings under Chapter 13 can benefit debtors and creditors alike. Debtors are allowed to retain their assets, commonly their home or car. And creditors, entitled to a Chapter 13 debtor's "disposable" postpetition income, § 1325(b)(1), usually collect more under a Chapter 13 plan than they would have received under a Chapter 7 liquidation.

*Harris v. Viegelahn*, 135 S. Ct. 1829 (2015). The Ninth Circuit provides a more detailed explanation in *In re Blendhein*, including a discussion of the discretionary tools that debtor can use in crafting a repayment plan to modify terms of debts during repayment and discharge debts following the completion of the plan. 803 F.3d 477, 485–87 (9th Cir. 2015). Repayment plans confirmed by a bankruptcy court are binding on creditors, and upon confirmation, creditors lose any claim to the debtor's property as except as provided in the plan. 11 U.S.C. § 1327.

### 2. Theories Not Properly Raised in the Complaint

As a starting point, the Court agrees with Seterus that Kaplan's assertion in her opposition that Seterus's responses failed to comply with 12 C.F.R. § 1024.35(e)(1)(i)(B)—which defines the notification a servicer must provide when it determines that no error occurred—falls outside the scope of the claims stated in her complaint. Setting aside claims disposed of by the arguments that Kaplan declined to oppose in her opposition brief, *see* Opp'n at 8 n.5, Kaplan's operative complaint includes two theories of liability under RESPA: (1) that Seterus "fail[ed] to make appropriate correction's to [Kaplan's] account in response to the [March 2015] qualified written request, including the crediting of any late charges or penalties, and fail[ed] to transmit written notice of such corrections to [Kaplan] no later than 30 days after receipt of [Kaplan's] qualified written request, in violation of 12 U.S.C. § 2605(e)(2)(A)," SAC ¶ 74.b; and (2) that Seterus similarly failed to make corrections and provide notice of such corrections in response to the November 2015 fax, *id.* ¶ 82. The complaint does not put Seterus on notice of a theory that its responses did not meet the regulatory requirements for a response stating that Seterus determined no error occurred.

The Ninth Circuit has addressed in the context of the Age Discrimination in Employment Act ("ADEA") the question of whether a plaintiff can invoke a theory not stated in the complaint to survive a motion for summary judgment:

> Allowing Jeney, Gentile and Coleman to proceed with their disparate impact theory after the close of discovery would prejudice Quaker. A complaint guides the parties' discovery, putting the defendant on notice of the evidence it needs to adduce in order to defend against the plaintiff's allegations. A disparate impact theory, lacking the requirement that the plaintiff prove intent and focusing on statistical analyses, requires that the defendant develop entirely different defenses, including the job relatedness of the challenged business practice or its business necessity. Neither of these are necessary to defend against a disparate treatment theory. This case illustrates the problem. At no time prior to summary judgment, did Jeney, Gentile, or Coleman identify which facially neutral Quaker employment practice they challenged as having a discriminatory impact. *Cf. Josey* [*v. John R. Hollingsworth Corp.*, 996 F.2d 632, 642 (3d Cir. 1993)]. The district court judge's opinion indicates that after more than two years of discovery, he had no idea until the employees' motions for summary judgment were filed that they intended to pursue this legal theory. The lack of notice on this issue central to the cause of action makes it difficult, if not impossible, for Quaker to know how to defend itself. After having focused on intentional discrimination in their complaint and during discovery, the employees cannot turn around and surprise the company at the summary judgment stage on the theory that an allegation of disparate treatment in the complaint is sufficient to encompass a disparate impact theory of liability.

*Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292–93 (9th Cir. 2000). The Ninth Circuit went on to hold that plaintiffs cannot proceed on a disparate impact theory in an ADEA case unless either: (1) the theory is pleaded in the complaint; or (2) the plaintiffs "make known during discovery their intention to pursue recovery on the disparate impact theory omitted from their complaints." *Id.* at 1294.

*Coleman* provides an appropriate framework for analyzing Seterus's argument. The distinction between the different RESPA claims stated in Kaplan's complaint and raised for the first time in her opposition brief is comparable to the distinction between a disparate treatment and disparate impact claim under the ADEA, and courts have applied *Coleman* in other contexts as well. *See, e.g.*, *Patel v. City of Long Beach*, 564 F. App'x 881, 882 (9th Cir. 2014) (citing *Coleman* to affirm summary judgment where a plaintiff asserted a claim for denial of access to courts, but raised a claim for retaliation in violation of the First Amendment for the first time in opposition to summary judgment). As noted above, Kaplan's complaint does not put Seterus on notice of a RESPA claim for failure to include required information with a statement that Seterus found no violation. And while the rule of *Coleman* would also allow this sort of related but not-

explicitly-pleaded claim to proceed if Seterus had notice of it during discovery, there is no indication in the record that Kaplan gave Seterus notice of such a theory during discovery, or otherwise, before filing her opposition brief.

One district court has described the *Coleman* analysis as "focused on prejudice to the defendant." *Pena v. Taylor Farms Pac., Inc.*, No. 2:13-CV-01282-KJM-AC, 2014 WL 1330754, at *4 (E.D. Cal. Mar. 28, 2014). The Court assumes for the sake of argument that Seterus was not significantly prejudiced in its ability to contest whether its responses violated the regulation, since whether such a violation occurred would seem to depend solely on the responses themselves and thus not require further discovery. Prejudice is apparent, however, when it comes to damages, because without knowledge that Kaplan intended to pursue a claim based on Seterus's failure to comply with 12 C.F.R. § 1024.35(e)(1)(i)(B), Seterus had no reason to probe what damages Kaplan suffered as a result of such noncompliance. Given that fact discovery closed on July 3, 2017—four days before Kaplan filed her opposition brief and first raised the regulatory compliance issue therein—Seterus was prejudiced by not having a reason and opportunity to investigate that aspect of damages while discovery was open. The Court therefore holds that Kaplan cannot pursue liability based on the theory that Seterus failed to comply with the requirements set forth in 12 C.F.R. § 1024.35(e)(1)(i)(B) for a statement that a loan servicer found no error in response to a QWR.

To the extent that the opposition brief could be construed as raising other theories besides failure to correct an error and provide notice of correction, or to the extent that other deficiencies not raised in the briefs are apparent from the record (i.e., the fact that Seterus's April 27, 2015 letter in response to Kaplan's March 2015 fax failed to address in any way the October 2013 payment at issue in the fax, and instead discussed a payment Kaplan made a year earlier in October 2012), the same reasoning requires limiting Kaplan's RESPA claim to the theories set forth in her complaint and not waived by footnote five of her opposition: that Seterus failed to correct errors identified in Kaplan's March 2015 and November 2015 faxes.

### 3. Claim for Failure to Make Corrections After the March 2015 Fax

Kaplan's complaint and opposition characterize her March 16, 2015 fax as identifying an

error or errors related to her loan, but do not clearly specify the nature of the error. *See* Compl. ¶ 72; Opp'n at 2, 9. Based on the fax itself, it is apparent that although it describes perceived errors, they are not the purported error at the heart of Kaplan's present argument—that Seterus accounted for her loan based on the terms of the contract rather than the bankruptcy plan, and continued to apply payments to older months based on the Kaplan's pre-petition delinquency.

Instead, the March fax asserts that Seterus erred by informing Kaplan that she "*missed a payment*" in April of 2012 and October of 2013, the latter as a result of the partial payment having been returned. Kaplan Decl. Ex. A; Seterus Decl. Ex. 3. Kaplan asserts in the fax that she in fact made payments those months, and although she did not pay the full amount in October of 2013, her partial payment was held in a suspense account rather than returned.[10] Kaplan Decl. Ex. A; Seterus Decl. Ex. 3. She attaches records from her bank showing that she made those payments. Seterus Decl. Ex. 3. The errors that the March fax identifies are therefore: (1) that Seterus's records reflected Kaplan missing a payment in April of 2012 that she in fact made (apparently referring to the payment she made on March 29, 2012, which she circled in the attached bank statement); and (2) that Seterus's records reflected Kaplan's October 2013 partial payment having been returned when it was in fact held in suspense. *See id.*

Seterus's April 27, 2015 letter to Kaplan's bankruptcy counsel was largely a non sequitur, confirming the prior servicer's receipt of Kaplan's October 3, 2012 payment without addressing the October 2013 payment that Kaplan actually asked about,[11] and explaining that Seterus needed more time to research "Ms. Kaplan's request for the March 29, 2012 payment," which—

---

[10] Seterus's motion mischaracterizes the fax as "acknowledg[ing]" the October 2013 payment "as being returned by [Kaplan's] bank." Mot. at 7. The fax includes the phrase "my payment was returned by my bank, Wells Fargo," but in the context of describing the erroneous information that a Seterus telephone representative had given Kaplan. *See* Kaplan Decl. Ex. A. Given that the fax goes on to state that "[f]or October . . . the money was put in SUSPENSE – not returned," no plausible reading of the fax as a whole supports Seterus's position that Kaplan acknowledged money having been returned. *See id.* (capitalization in original).

[11] The mistake does not appear to have been merely a typographical error as to the year, because the bank statement attached to Kaplan's fax and the account activity report attached to Seterus's letter show that her October 2013 payment was sent on the eighth of the month and processed on the ninth, while the October 2012 payment that was not at issue was processed on the third, which is consistent with the date in Seterus's letter. *See* Seterus Decl. Ex. 3 at FNMA-000939; *id.* Ex. 5 at FNMA-000946, -000948.

presumably based on the attached bank statement—Seterus apparently understood to be the payment identified in the fax as "April 2012." *See* Seterus Decl. Ex. 5. But even though Seterus's letter mistakenly addressed Kaplan's October 2012 payment rather than her October 2013 payment, the account activity report attached to that letter shows that the prior servicer in fact received Kaplan's October 9, 2013 payment (with no indication that it was returned), *id.* at FNMA-000946, and the letter that Seterus sent directly to Kaplan on May 7, 2015 confirms that the prior servicer received the March 29, 2012 and October 8, 2013 payments and "posted [them] to the loan," *id.* Ex. 6. There is no indication in the record of any error after that point as to whether Kaplan made the March (or April) 2012 payment or whether the October 2013 payment was returned. Accordingly, the record reflects either that no error existed in Seterus's file— although a telephone representative might have given Kaplan incorrect information—or that if there was such an error, it was corrected after Kaplan brought it to Seterus's attention by sending the fax. Kaplan states in her declaration that she understood from Seterus's letter "that Seterus corrected the errors on [her] account." Kaplan Decl. ¶ 13. There is no evidence on which a rational jury could conclude that Seterus failed to correct an error actually identified in Kaplan's March 16, 2015 fax, or that Seterus failed to give Kaplan notice of such a correction. Seterus is therefore entitled to summary judgment on Kaplan's RESPA claim to the extent that it is based on that fax.

Because the March 2015 fax only identified errors as to purportedly missed or returned payments, it did not give Seterus notice that Kaplan believed Seterus's overall method of accounting for her pre-petition delinquency to be an error, and the Court need not resolve the propriety of that accounting method in order to resolve this theory of liability.

### 4. Claim for Failure to Make Corrections After the November 2015 Fax

Kaplan's November 30, 2015 fax more directly implicates Seterus's accounting method. Although Seterus contends that this fax is too "scattershot" to be a valid QWR and merely rehashes the issues raised in Kaplan's March 2015 fax, Mot. at 14–15, the issues raised are relatively straightforward, and the only purported error identified is distinct from those discussed in the earlier fax.

The November fax begins with three bullet points identifying "outstanding items" that, according to Kaplan, Seterus raised in its May 18, 2015 to her bankruptcy lawyer: (1) that Kaplan owed her full February 2015 payment; (2) that a partial payment of slightly more than $1,300 was being held in suspense;[12] and (3) that the loan was delinquent for the June 2014 installment at the time that it was transferred to Seterus in September of 2014. Kaplan Decl. Ex. E. Kaplan then states, "Here is my response:"—introducing another three bullet points responding to the issues set forth above. *Id.* First, she states that she will pay the delinquent February 2015 installment in February of 2016. *Id.* Second, she states that she is sending a check for $206.72 to complete the installment held in suspense. *Id.* Third, she addresses the purported June 2014 delinquency as follows:

> I am attaching proof that I paid the June 2014 payment. I pay my bills through my bank, Wells Fargo, and have attached my bank statement not only for June but for May, July, and August as well. Obviously, Chase made an error when transferring the account to Seterus.

*Id.* The fax concludes with Kaplan stating that she expects Seterus "to make this right and correct this outstanding delinquent amount and reflect this on my credit report as well." *Id.*

Although the November fax addresses multiple issues, it identifies only one purported error: that Seterus described the loan as having been delinquent for the June 2014 installment as of the time Seterus took over as servicer in September 2014. *Id.* The distinction between this purported error and the errors identified in the March 2015 fax discussed above, while perhaps subtle, is significant. In the earlier fax, the purported errors were a Seterus representative's assertion that Kaplan missed specific payments. *See id.* Ex. A. As discussed above, Seterus could remedy such an error in full by correcting its records to show that the payments at issue were made, or could show that there was no such error by showing that its records did not in fact reflect missed payments. In the November fax, however, the purported error was a record of a delinquent amount due on the loan. *See id.* Ex. E.[13] Answers to whether Kaplan made a particular payment,

---

[12] Although not stated in Kaplan's November fax, this suspense balance derives from Kaplan's partial October 2013 payment discussed above in the context of the March fax.

[13] Although Kaplan attached proof of four specific payments as evidence that the delinquency was erroneous, her fax identifies the error not as Seterus's failure to record one of those payments, but

23

and whether Seterus's records reflected that particular payment, do not in themselves resolve the question of whether the account was delinquent. Instead, that question depends on the amount that Kaplan actually owed on the loan and the aggregate amount that she paid up to that point. Seterus's response on December 1, 2015, which confirmed that the previous servicer received and "posted to the loan" Kaplan's payments in May through August of 2014, *id.* Ex. F, therefore does not show that Seterus corrected the purported error identified in the November fax, because it does not address whether the purported June 2014 delinquency at the time that Seterus took over as the servicer was valid.

At this point, the parties agree and the record reflects that the purported delinquency at issue arose from Kaplan's failure to pay all of her monthly installments before she filed for bankruptcy, and from Seterus's accounting practice of continuing to treat Kaplan's pre-petition missed payments as "contractually delinquent" after her Chapter 13 repayment plan was in place, despite the fact that she was repaying her arrearage for those missed payments through the plan. The question, then, is whether there is evidence and authority to support Kaplan's position that Seterus's accounting practice was an error in need of correction.

A handful of bankruptcy court decisions from other districts have held or suggested that a creditor or servicer violates the Bankruptcy Code or a bankruptcy court's orders by failing to account for a Chapter 13 repayment plan. *See In re Luedtke*, No. 02-35082-svk, 2008 WL 2952530, at *4 (Bankr. E.D. Wis. July 31, 2008) (holding that "[a]llowing creditors . . . to report the original amount of the loan and that the plan payments are excessively late based on the original loan terms . . . is contrary to the spirit and purpose of Chapter 13" and violated the court's order confirming the debtor's repayment plan); *In re Payne*, 387 B.R. 614, 632–33 (Bankr. D. Kan. 2008); *In re Jones*, 366 B.R. 584, 590 (Bankr. E.D. La. 2007) ("As for the postpetition debt, the confirmation of a plan recalibrates the amounts owed by Debtor as of the petition date.

---

instead as the purported delinquency itself. It appears that Kaplan presented her payment of installments in the months around the time of the purported delinquency as the *reason why she believed* the delinquency was erroneous, not that she intended to limit her inquiry to the issue of whether those four payments were received and accounted for. *See* 12 U.S.C. § 2605(e)(1)(B)(ii) (requiring a QWR to "include[] a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error").

Because the prepetition arrearage is paid by the Trustee under the plan, Debtor's account gets a fresh start, free of all past due sums.").  Generally, however, those decisions have focused on adverse effects of such accounting that Kaplan does not claim are present here, such as "late charges, fees, and other expenses assessed to a debtor's loan as a result of postpetition accounting mistakes made by lenders."  *In re Jones*, 366 B.R. at 590–91 (stating that the lender's practices in that case "resulted in such a tangled mess that neither Debtor, who is a certified public accountant, nor [the lender's] own representative could fully understand or explain the accounting offered"); *see also In re Payne*, 387 B.R. at 632–33 (concluding that the servicer's failure to properly account for a Chapter 13 repayment plan kept the "Debtors' principal balance artificially high and accruing more interest than it should," and that the servicer wrongfully rejected payments because it erroneously considered the debtors to be in default).

The other category of cases on which the parties rely is recent decisions from this district addressing FCRA claims based on continued reporting—to or by credit reporting agencies—of debtors' full contractual delinquencies without regard for the confirmation of a Chapter 13 repayment plan.[14]  To the best of this Court's knowledge, Judge Chhabria's decision in *Aulbach* is the only such order to conclude that allegations of a credit reporting agency reporting a pre-confirmation delinquency during the pendency of such a repayment plan states a claim for violates the FCRA, although he nevertheless dismissed the complaint with leave to amend for failure to allege damages.  *See* __ F. Supp. 3d at __, 2017 WL 1807612.  That decision held that although a debtor might ultimately fail to complete a repayment plan and the debts might therefore revert to their pre-confirmation state, "the nature of the debt changes as a result of a Chapter 13 confirmation, contingency notwithstanding," and "the Chapter 13 process adjusts the debt so that there is no longer anything 'past due'—there is merely an obligation to pay the trustee going forward."  *Id.* at *3, *4.

---

[14] The plaintiffs in the vast majority of these recent cases were represented by a single law firm and, as far as the Court is aware, raised similar arguments.  *See Lugo v. Experian Info. Sols., Inc.*, No. 5:16-CV-04647-EJD, 2017 WL 2214641, at *6 (N.D. Cal. May 19, 2017)  ("Importantly, the current state of authority in this district has developed around a particular set of factual allegations, asserted verbatim in hundreds of complaints brought by individuals represented by Plaintiff's counsel, all involving post-confirmation but pre-discharge credit reporting.").

Decisions by at least fourteen other judges of this district have reached the opposite conclusion, granting motions to the dismiss on the basis that allegations of reporting pre-confirmation dates during the pendency of a Chapter 13 repayment plan did not state a claim for violation of the FCRA.[15]  These decisions generally hold that "the legal status of a debt does not change until the debtor is discharged from bankruptcy," not merely when a repayment plan is confirmed, "because if a debtor fails to comply with the Chapter 13 plan, the debtor's bankruptcy petition can be dismissed, in which case the debt will be owed as if no petition for bankruptcy was filed."  *E.g.*, *Doster v. Experian Info. Sols., Inc.*, 16-CV-04629-LHK, 2017 WL 264401, at *5 (N.D. Cal. Jan. 20, 2017).  At least one such case is currently pending on appeal before the Ninth Circuit.  *See Jara v. Experian Info. Sols.*, No. 16-CV-03336-LHK, 2016 WL 7337540 (N.D. Cal. Dec. 19, 2016), *appeal pending sub nom. Jara v. Equifax, Inc.*, No. 17-15201 (9th Cir.).

The near-uniformity of FCRA cases granting motions to dismiss conceals a nuance that many of those decisions recognized: the potential relevance of whether a credit report references a debtor's pending Chapter 13 bankruptcy.  *E.g.*, *Smith v. Experian Info. Sols., Inc.*, No. 16-cv-04651-BLF, 2017 WL 1489689, at *6 (N.D. Cal. Apr. 26, 2017) ("It is this Court's view that it may well be possible for a plaintiff to allege facts showing that the reporting of a pre-confirmation debt or delinquency is materially misleading absent any reference to a pending Chapter 13 bankruptcy in the report, at least where a confirmed plan governs the timing and amounts of post-

---

[15] *E.g.*, *Jugoz v. Experian Info. Sols.*, 2017 WL 2720184 (N.D. Cal. June 23, 2017) (Chesney, J.); *Messano v. Experian Info. Sols., Inc.*, No. 16-cv-05697-HSG, 2017 WL 1833280 (N.D. Cal. May 8, 2017) (Gilliam, J.); *Conrad v. Experian Info. Sols., Inc.*, No. 16-cv-04660 NC, 2017 WL 1739167 (N.D. Cal. May 4, 2017) (Cousins, J.); *Smith v. Experian Info. Sols., Inc.*, No. 16-cv-04651-BLF, 2017 WL 1489689 (N.D. Cal. Apr. 26, 2017) (Freeman, J.); *Cristobal v. Equifax, Inc.*, No.16-cv-06329-JST, 2017 WL 1489274 (N.D. Cal. Apr. 26, 2017) (Tigar, J.); *Mensah v. Experian Info. Sols., Inc.*, Nos. 16-cv-05689-WHO, et al., 2017 WL 1246892 (N.D. Cal. Apr. 5, 2017) (Orrick, J.); *Reckelhoff v. Experian Info. Sols., Inc.*, No. C 16-6378 SBA, 2017 WL 1208398 (N.D. Cal. Mar. 31, 2017) (Armstrong, J.); *Mamisay v. Experian Info. Sols., Inc.*, No. 16-CV-05684-YGR, 2017 WL 1065170 (N.D. Cal. Mar. 21, 2017) (Gonzalez Rogers, J.); *Fair v. Experian Info. Sols., Inc.*, No. C 16-5712 CW et al., 2017 WL 1164225 (N.D. Cal. Mar. 29, 2017) (Wilken, J.); *In re: Experian Info. Sols. Reporting Litig.*, No. C 16-05674 WHA, 2017 WL 1319843 (N.D. Cal. Mar. 28, 2017) (Alsup, J.); *Coulbertson v. Experian Info. Sols.*, No. 16-cv-05672-RS et al., 2017 U.S. Dist. LEXIS 69484, at *9-11 (N.D. Cal. Mar. 25, 2017) (Seeborg, J.); *Rara v. Experian Info. Sols., Inc.*, No. 16-cv-06376-PJH, 2017 WL 1047020 (N.D. Cal. Mar. 20, 2017) (Hamilton, C.J.); *Doster v. Experian Info. Sols., Inc.*, No. 16-CV-04629-LHK, 2017 WL 264401 (N.D. Cal. Jan. 20, 2017) (Koh, J.); *Biggs v. Experian Info. Sols., Inc.*, 209 F. Supp. 3d 1142, 1144–45 (N.D. Cal. 2016) (Davila, J.).

26

confirmation payments on the debt."); *Mensah v. Experian Info. Sols., Inc.*, Nos. 16-cv-05689-WHO et al., 2017 WL 1246892 (N.D. Cal. Apr. 5, 2017); *Devincenzi v. Experian Info. Sols., Inc.*, No. 16-CV-04628-LHK, 2017 WL 86131, at *7 (N.D. Cal. Jan. 10, 2017). The possibility that agencies might be required to report at least the existence of a repayment plan potentially diminishes the divide between the majority of these cases and the *Aulbach* decision, which did not hold that reporting agencies should list *only* the post-confirmation status of the debt under the repayment plan, but instead that agencies might be required to reflect both its pre-confirmation status before the plan and its post-confirmation status under the plan. *Aulbach*, __ F. Supp. 3d at __, 2017 WL 1807612, at *5.

Kaplan's RESPA claim here does not necessarily turn on precisely the same questions as the FCRA cases. On both sides of the divide, *Aulbach* and several of the majority decisions cite the expectations and needs of potential lenders viewing a credit report in support of their conclusions. *See id.* at *4 ("A prospective lender may well want to be informed of the difference between these two types of debts."); *Jugoz v. Experian Info. Sols.*, 2017 WL 2720184, at n.7 ("[A] plan confirmation '. . . does not change the fact of a debt's delinquency, and . . . new creditors are undoubtedly interested in defaults on prior accounts when determining an applicant's creditworthiness.'" (citation omitted; second ellipsis in original)). The question of what would be inaccurate or misleading to a potential lender reviewing a credit report, however, is not necessarily equivalent to what would be erroneous as an accounting practice for a current loan servicer seeking to collect a debt. Some of the considerations identified in both *Aulbach* and decisions reaching the opposite outcome are nevertheless informative here. Consistent with the majority view of the FCRA cases, a Chapter 13 plan does not erase the fact that Kaplan missed payments before filing for bankruptcy, her debts remain legally valid until discharge, and there remains a possibility of her obligations reverting to their pre-petition status if the bankruptcy case is dismissed. Consistent with *Aulbach*, while the Chapter 13 plan is in place, it has a real and significant legal effect on Kaplan's obligations and on the steps that Seterus can and cannot take to collect from her.

The Court holds that a loan servicer's practice of accounting for a loan based on the terms

of the contract, despite the existence of a confirmed Chapter 13 repayment plan limiting the servicer's ability to collect on those terms, is not in itself an "error" requiring correction under RESPA—so long as the servicer is able to maintain its account in such a way as to ensure that debtor pays no more than is required under the plan and is not subject to improper fees, rejected payments, foreclosure, or other such adverse effects. *Cf. In re Jones*, 366 B.R. at 590; *In re Payne*, 387 B.R. at 632–33. The fact that a servicer accounts for the loan based on its original terms is not inherently erroneous, both because—as recognized by many decisions in this district in the context of the FCRA—the original debt remains legally valid, if not presently collectable, until discharge, and also because a servicer may for legitimate reasons wish to remain prepared for the possibility that the Chapter 13 petition might at some point be dismissed or converted to a Chapter 7 proceeding due to noncompliance and the loan might revert to its original terms. *See, e.g.*, *Doster*, 2017 WL 264401, at *5.

Kaplan does not identify any evidence in this case that Seterus's accounting based on the original terms of the loan led to the sort of concrete errors discussed in *Jones* and *Payne*. Moreover, the May 18, 2015 correspondence that Kaplan's November 30, 2015 fax cites as containing an erroneous reference to a June 2014 delinquency describes the loan as "contractually delinquent" at that time, and goes on to explain, albeit with imperfect clarity, the distinction that Seterus draws in which a loan can be current "according to the terms of the Bankruptcy plan" and yet not at "a contractually current status." Kaplan Decl. Ex. C. Because there is uncontroverted evidence that Seterus recognized a distinction between the loan's status under the original contract terms and under Kaplan's bankruptcy plan, and no evidence that Seterus's accounting practices led to concrete adverse effects such as improper charges, the Court holds that a rational finder of fact could not find on this record that Kaplan's November 30, 2015 fax identified an error requiring correction under RESPA, and therefore could not find that Seterus's failure to correct such an error violated 28 U.S.C. § 2605(e)(2)(A). Seterus is entitled to summary judgment on Kaplan's RESPA claim. The Court does not reach the parties' arguments regarding damages.

## C.  CCRAA Claim

Kaplan's opposition requests that if the Court grants summary judgment as to her RESPA

28

claim, the Court remand her CCRAA claim to state court. Opp'n at 13. Seterus does not address that request in its reply. At the hearing, counsel for Seterus agreed that remanding the CCRAA would probably be appropriate if the RESPA claim did not go forward, although counsel noted that the CCRAA is similar to, and often interpreted in a manner consistent with, the federal FCRA.

On removal, the stated basis for this Court's jurisdiction over Kaplan's state-law CCRAA claim was 28 U.S.C. § 1367(a), which provides for supplemental jurisdiction over claims related to another claim falling within a district court's jurisdiction—here, Kaplan's federal RESPA claim. "The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a)," however, where "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "'[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.'" *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 561 (9th Cir. 2010) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7 (1988)) (alteration in *Sanford*). As far as this Court is aware, no California state court has yet considered the question of whether or when reporting pre-petition delinquencies on a loan that is subject to a Chapter 13 repayment plan violates the CCRAA, further supporting the conclusion that principles of comity weigh in favor of allowing state courts to address this novel issue of state law, and providing a separate and sufficient statutory basis for declining to exercise jurisdiction. *See* 28 U.S.C. § 1367(c)(1) (providing that a court may decline to exercise supplemental jurisdiction where a "claim raises a novel or complex issue of State law"). And although defense counsel is correct that the CCRAA is generally held to be consistent with the FCRA, *Aulbach* demonstrates that interpretation of the federal statute is not entirely settled; even if it were, the California courts have not yet spoken as to whether they will apply FCRA precedent *as to this issue* to claims under the CCRAA.

The Court therefore REMANDS this remaining claim to state court without reaching the parties' arguments as to its merits.

## IV.    CONCLUSION

For the reasons discussed above, Seterus's motion for summary judgment is GRANTED except as to Kaplan's claim under the CCRAA, which is REMANDED to the Superior Court of California for Contra Costa County. The Clerk is instructed to enter judgment consistent with this order and to close the file.

**IT IS SO ORDERED.**

Dated: August 14, 2017

_____
JOSEPH C. SPERO
Chief Magistrate Judge